# United States Court of Appeals
## For the First Circuit

No. 06-1452

RACHELLE R. GREEN, BYRON R. RENFRO,

Plaintiffs, Appellants,

v.

EXXONMOBIL CORPORATION; JANET L. MADIGAN, in her
official capacity as Plan Administrator for ExxonMobil
Corporation; EXXONMOBIL LIFE INSURANCE PLAN,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux,  Senior U.S. District Judge]

Before

Boudin, Chief Judge,

Torruella, Circuit Judge,

and Schwarzer,* Senior District Judge.

Matthew T. Oliverio with whom Raymond A. Marcaccio, Christine
M. Curley and Oliverio & Marcaccio LLP were on brief for
appellants.
Adriene K. Dwyer, U.S. Department of Labor, Plan Benefits
Security Division, with whom Howard M. Radzely, Solicitor of Labor,
Timothy D. Hauser, Associate Solicitor, and Karen L. Handorf,
Counsel for Appellate and Special Litigation, were on brief for
Elaine L. Chao, Secretary of the United States Department of Labor,
Amicus Curiae.

*Of the Northern District of California, sitting by
designation.

Neal J. McNamara with whom Nixon Peabody LLP was on brief for appellees.

_____

December 8, 2006

_____

**BOUDIN**, <u>**Chief Judge**</u>.  In April 1996, Dr. Robert Renfro began working for Mobil Oil Corporation as a contract physician at the Beaumont, Texas, oil refinery.  In the fall of 2000, Dr. Renfro sought a full-time, salaried position as a staff physician with ExxonMobil Corporation.  Dr. Renfro received a letter confirming his appointment on January 15, 2001, began work on February 19, was injured in a car accident on February 25 and died on February 26.

At the time of his death, Dr. Renfro was 57 years old, divorced, and had two grown children.  ExxonMobil's employee benefits package ("the plan") included life insurance coverage, and Dr. Renfro became a covered employee as of February 19 when he began work.  Under the plan, Dr. Renfro was automatically entitled to 200 percent of his base salary (then $157,000 per year) and, with a similar payment for basic accidental death coverage, his heirs have now received $628,000 under the plan.

Under the plan, an employee could also elect additional group life insurance ("GUL") and, in addition, further coverage called voluntary accidental death and dismemberment ("VADD").  The premiums, each dependent on the level of coverage selected, were fairly modest; but the premiums had to be paid by the employee and required an affirmative election.  For GUL, election after 31 days required a medical examination.

At the time of his death, Dr. Renfro had not yet received the election forms; they had been placed in the mail outbox on

February 26, 2001. ExxonMobil employed a multi-step process for preparing and delivering the forms for new employees. According to later evidence, it was not uncommon for there to be some delay in furnishing them.

Just what elective benefits Dr. Renfro would have chosen, if any, is unknown--although his children assert that the benefits package was a primary motive in his choosing to become a full-time, salaried employee of ExxonMobil. In all events, on February 26 and 27, 2001, after learning of Dr. Renfro's death, several ExxonMobil employees purported retroactively to elect maximum GUL and VADD coverage for Dr. Renfro.

Specifically, Kathy McCoy, a benefits services supervisor at ExxonMobil, emailed company legal counsel Sherry Englande stating that she wished to elect maximum optional GUL and VADD benefits for Dr. Renfro. McCoy may or may not have spoken with Elda Smith, the U.S. benefits manager for the company, but did not copy Smith on the email to Englande. When Englande agreed with McCoy's proposal, McCoy directed an employee in the Houston office to enter maximum GUL and VADD coverage for Dr. Renfro as of February 23, 2001.

On April 11, 2001, a benefits counselor in Houston sent Dr. Renfro's heirs (his two children) a letter with an attachment labeled "Estimate of Survivor Benefits," which stated that the children would receive $628,000 for the basic coverage, $785,000

for GUL benefits, and $1,256,000 for the VADD benefits. A prominent disclaimer in the letter states: "In the event of any inconsistency between the information contained in this statement and the provisions of the plans, the plans, as well as any applicable administrative regulations, will govern."

Not surprisingly, the plan's insurer for GUL and VADD benefits, MetLife, rejected the request that it pay life insurance claims for someone who had not elected coverage prior to a fatal accident. At that point, ExxonMobil's plan administrator, Janet Madigan, was consulted for the first time. Under the plan, she had ultimate decision-making and interpretive authority.

Madigan consulted another ExxonMobil lawyer, who said that only Madigan could approve a retroactive election. Madigan then declined to do so. On May 10, 2001, a letter was mailed to Dr. Renfro's children stating that, contrary to the earlier letter, Dr. Renfro was not eligible for GUL and VADD benefits because he had not signed an election form.

Dr. Renfro's children protested the corrected benefits determination, but ExxonMobil denied their appeal. The children asserted that Dr. Renfro would have elected the additional coverage if the forms had been timely provided to him. Dr. Renfro, they said, not only had become a full-time employee partly to secure benefits, but he had in fact requested benefit election forms from

-5-

the company (a contention that ExxonMobil disputes). Madigan declined to reconsider her decision.

The children eventually sued ExxonMobil, Madigan and the plan in federal district court. Two claims under the Employee Retirement Income Security Act of 1974 ("ERISA") were pressed at trial: one for benefits due under the plan, 29 U.S.C. § 1132(a)(1)(B); the other for equitable relief on the ground that the delay in furnishing the forms was a breach of fiduciary duty, id. § 1132(a)(3). After a five-day bench trial, the district judge rejected the children's claims. Green v. ExxonMobil Corp., 413 F. Supp. 2d 103, 119 (D.R.I. 2006). They now appeal to this court.

The conventional standard of review of the district court's decision is for clear error as to fact findings and de novo on issues of law, Coady Corp. v. Toyota Motor Distribs., Inc., 361 F.3d 50, 54 (1st Cir. 2004), with some latitude in the latter case for fact-specific law-application rulings. Id. at 57. Where the plan administrator has discretionary authority to interpret and apply the plan, as Madigan did in this case, such rulings are themselves reviewed for arbitrariness. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Glista v. Unum Life Ins. Co. of Am., 378 F.3d 113, 126 (1st Cir. 2004).

In appealing from the district court decision, the claimants offer four main arguments: that subordinate ExxonMobil employees made a valid and binding election on behalf of Dr. Renfro

which cannot be undone; that (alternatively) the company is estopped from denying the election; that ExxonMobil was responsible for any failure by Dr. Renfro to elect coverage; and that the district court should have found a breach of fiduciary duty by ExxonMobil. We consider these arguments in turn.

Under the plan, GUL and VADD benefits required an election. It is a fair reading of the provisions dealing with the life insurance component--which refer repeatedly to the "employee" or "participant" electing coverage--that Dr. Renfro (or an assignee of his interest) was the person to make the election; and, as an election required the employee to undertake to pay the premiums, this makes further sense.[1]

Nothing in the plan explicitly provides for someone else (except an assignee) to make an election for the employee, let alone to do so retroactively after an accident has occurred. Further, under the plan, Madigan had the requisite authority to interpret and apply the plan--a decision to which we ordinarily defer unless it is unreasonable.[2] Madigan's decision that McCoy

---

[1]The signature line on the enrollment form for GUL and VADD benefits requires the signature of "participant or assignee." The plan permitted the employee under certain conditions to assign his interest in the insurance; but it did not provide for anyone else to act for the employee.

[2]Firestone, 489 U.S. at 115; Glista, 378 F.3d at 125-26; Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 212-13 (1st Cir. 2004). In unusual cases less deference may be given where the plan administrator has a conflict of interest, Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005),

and other subordinates had no authority to make a retroactive election for Dr. Renfro is far from unreasonable.

Conceivably, Madigan could have read the plan differently without being unreasonable. Each side reads the plan as if it mechanically dictated answers as to whether other employees could act for Dr. Renfro or whether Madigan or others could excuse omissions. To us, these are issues not explicitly addressed in the plan. Filling such gaps is ordinarily within the province of an administrator with discretionary authority.

Claimants say that the subordinates were, like Madigan, "fiduciaries" under ERISA regulations; but whether they were or not has little to do with whether they had authority under the plan to elect post-accident benefits for Dr. Renfro. To say that someone is a fiduciary suggests special obligations in the exercise of authority (although the kind and degree may vary, SEC v. Chenery Corp., 318 U.S. 80, 85-86 (1943) (Frankfurter, J.)). But authority to act depends on the plan and background agency law.

Nor is such a ruling inconsistent with the claimants' contention that some of the lower-level employees exercised "discretion" in various matters concerning benefits. In all likelihood some of them did. But this does not answer the question whether their discretion extended to making a post-accident

---

but the fact that the plan will save money by an individual decision does not standing alone preclude deference. Glista, 378 F.3d at 125-26.

election for an employee who had not himself made one or committed himself to pay premiums--certainly an eyebrow-raising event in the administration of an ERISA plan.

Claimants say that the subordinates did, apparently with later consent by Madigan, elect medical benefits for Dr. Renfro. After the accident a benefits employee approved PPO/Traditional medical coverage (as opposed to the HMO option) for Dr. Renfro to cover his medical care while he was on life support on February 25 and 26. But this does not prove that the subordinate had authority to do this--Madigan said the subordinate did not--and it also appears that PPO/Traditional coverage was the default option for medical benefits.

Claimants also say that Madigan admitted that she herself could have retroactively approved GUL and VADD benefits for Dr. Renfro. Our reading of the transcript is otherwise. In any event, imputing such power to Madigan or, with her consent, to subordinates might be a possible reading of the plan; but again it is not dictated by any language in the plan: at most it might have been a reasonable construction which Madigan did not have to adopt.

In a second line of attack, complainants argue that ExxonMobil did grant GUL and VADD benefits to Dr. Renfro, made the lack of authority claim only belatedly and is now estopped from denying coverage. They rely in particular on the April 11, 2001, "Estimate of Survivor Benefits" letter already described, on

supposed false explanations and efforts at concealing error by ExxonMobil (which is required to explain its denial of benefits[3]), and on our decision in Glista.

The benefits letter is labeled as an "Estimate of Survivor Benefits" with the disclaimer already quoted that the plan prevails over the estimate in the event of inconsistencies. The plan, in our view, includes the administrator's reasonable interpretation of it. The benefits letter clearly was not a commitment or contract and created no obligation. See Perreca v. Gluck, 295 F.3d 215, 225-26 (2d Cir. 2002) (statement of projected benefits created no promissory estoppel).

Nor does Glista assist claimants. There, the plan administrator denied a claim under one provision of a plan and then, after litigation began, the company relied upon a different provision never invoked by the administrator. Based on a variety of factors, this court refused to consider the alternative ground. Whatever the scope of Glista--and estoppel-like objections tend to depend heavily on the facts, as Glista itself stressed, 378 F.3d at 130-31--ExxonMobil has not switched grounds during litigation.

Once Madigan was faced with the issue, she directed that a letter be written which, dated May 10, 2001, stated that GUL and

_____

[3]Both the statute and the regulations require that denials be specifically explained, 29 U.S.C. § 1133 (2000); 29 C.F.R. § 2560.503-1(g), (j) (2005) (the version in force at the time of the denial was identical in relevant substance), and the ExxonMobil plan itself had a similar provision.

-10-

VADD benefits are provided under the plan "only after an employee elects to participate in the coverages. Because your father had not elected to participate before his accident, he was not covered . . . ." That the letter described the earlier estimate letter as a "miscommunication" hardly detracts from the clarity of Madigan's explanation for the denial. Nor does any embarrassment on the part of subordinates create an obligation where none existed.

Claimants' third argument is that ExxonMobil caused or contributed to Dr. Renfro's failure to complete the election forms by failing to provide them at the outset of his employment. The claimants say that Dr. Renfro would have elected and agreed to pay for GUL and VADD benefits at the maximum level if he had been provided the forms before his death. We will assume this arguendo even though no finding was made on this issue and the evidence for the assumption is debatable.

Claimants then enlist decisions under ERISA in which employee claims for benefits were upheld (or not dismissed for failure to exhaust administrative remedies) where misfeasance or misrepresentations by the company undercut or precluded coverage to which the employee might otherwise have been entitled.[4] Claimants

---

[4]Principal circuit cases are <u>Bowerman</u> v. <u>Wal-Mart Stores, Inc.</u>, 226 F.3d 574, 586 (7th Cir. 2000); <u>Swaback</u> v <u>Am. Info. Techs. Corp.</u>, 103 F.3d 535, 542 (7th Cir. 1996); <u>Epright</u> v. <u>Envt'l Resources Mgmt., Inc. Health & Welfare Plan</u>, 81 F.3d 335, 341 (3d Cir. 1996); <u>Conley</u> v. <u>Pitney Bowes</u>, 34 F.3d 714, 717 (8th Cir. 1994).

-11-

also invoke general contract doctrine, not necessarily binding but informative in the ERISA context, <u>Allen</u> v. <u>Adage, Inc.</u>, 967 F.2d 695, 698 (1st Cir. 1992), by which courts may excuse non-performance of a condition precedent where caused by the other party. Restatement (Second) of Contracts § 245 (1981); <u>Swaback</u>, 103 F.3d at 542.

Not unexpectedly the ERISA decisions that favor employee claims in these circumstances coexist with others disallowing estoppel and waiver arguments against ERISA plans.[5] As usual, unresolved tensions in doctrine arise as courts engage in the normal case-by-case effort to flesh out the statute, results being driven in part by the particular facts--which present a wide range of different problems and circumstances.

The circuit cases favoring employees are almost all egregious cases in which the company took wrongful affirmative action or made misrepresentations that interfered with benefits. <u>See</u> note 4, above.[6] Of course, an outright refusal of ExxonMobil

---

[5]<u>City of Hope Nat'l Med. Ctr.</u> v. <u>Healthplus, Inc.</u>, 156 F.3d 223, 230 n.9 (1st Cir. 1998); <u>Law</u> v. <u>Ernst & Young</u>, 956 F.2d 364, 369 (1st Cir. 1992); <u>see also</u> <u>Lauder</u> v. <u>First Unum Life Ins. Co.</u>, 284 F.3d 375, 381 (2d Cir. 2002) (describing the circuits' positions on waiver in ERISA cases).

[6]<u>Newman-Waters</u> v. <u>Blue Cross/Blue Shield of Tenn.</u>, No. 1:04-CV-132, 2005 WL 1263026, at *22-23 (E.D. Tenn. May 27, 2005) may be the case most helpful to the claimants; but even if it was correctly decided (which is open to debate), the evidence as to frustration of intent was stronger and the remedy granted less extreme.

to provide forms for an extended period could well constitute improper behavior; but in this case the only issue is whether a failure to provide the forms on the day of employment or within a week thereafter was so improper as to excuse the need for an election.

Nothing in the plan or any representation by the company specified a fixed date for supplying the election documents to Dr. Renfro, nor does anything suggest that the delay in his case was deliberate or extraordinary. Claimants point out that Dr. Renfro had only 31 days to elect GUL coverage free of a medical examination (after that an examination was required). But when the car accident occurred, only seven days had elapsed and the forms were about to be sent well within the 31-day period.

In a perfect universe, Dr. Renfro would perhaps have received the forms before he began work, but perfection is not a feasible standard of care. Dr. Renfro was never promised that enhanced life insurance coverage would necessarily be in force on the first day of work, nor was he inaccurately told that he had coverage when he did not. In sum, we agree with the district court that Dr. Renfro was not deprived by ExxonMobil of benefits due him under the plan and recoverable under 29 U.S.C. § 1132(a)(1).

This leaves for our consideration claimants' alternative statutory claim, namely, 29 U.S.C. § 1132(a)(3) ("section (a)(3)"), which provides that a civil action may be brought

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

Whether and when this provision provides an employee or his beneficiary a cause of action to recover damages for plan misconduct is the subject of more than one controversy.[7] The Secretary of Labor has filed with us an amicus brief, urging a broad construction of section (a)(3), adding that given the district court findings she is "extremely skeptical" that a breach of fiduciary duty occurred in this case.

We have no occasion to address the broader controversy about the scope of section (a)(3). The claimants' argument is that those who administered the plan had a general fiduciary duty to Dr. Renfro and violated it by not assuring that he had the necessary election forms at the start of his employment. We will assume, again arguendo, that a fiduciary duty was owed by at least some of those involved. Watson v. Deaconess Waltham Hosp., 298 F.3d 102, 111 n.12 (1st Cir. 2002).

---

[7]Circuits disagree on whether Varity Corp. v. Howe, 516 U.S. 489, 514-15 (1996), allows simultaneous claims under section (a)(1)(b) and section (a)(3). Compare, e.g., Tolson v. Avondale Indus., Inc., 141 F.3d 604, 610 (5th Cir. 1998), with Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 89 (2d Cir. 2001), cert. denied, 537 U.S. 1170 (2003). Also in dispute is what forms of relief can be "equitable." See, e.g., Sereboff v. Mid Atlantic Med. Servs. Inc., 126 S. Ct. 1869 (2006).

A fiduciary owes a special duty of loyalty not applicable in ordinary relationships, 29 U.S.C. § 1104(a)(1); but there is no claim here of deliberate wrongdoing or disloyalty. As for a duty of care, a fiduciary is expected to act with reasonable diligence, id. § 1104(a)(1)(B); but, for reasons already indicated, sending the forms within a week or so after employment--where no promise or plan deadline was violated--does not in the present circumstances even arguably comprise unreasonable conduct. Compare Blatt v. Marshall & Lassman, 812 F.2d 810, 813 (2d Cir. 1987) (18-month delay in executing necessary forms).

Life is filled with small events and choices that have large consequences; but hindsight is not the test of reasonableness. If Dr. Renfro had chosen to begin work at the start of January 2001, his children's recovery could have been larger; if he had chosen March, his children could have received nothing. We will not disturb the district court's decision.

Affirmed.